Good morning. My name is Ethan Ballo and today I speak for Manuel Jackson. I'm going to watch my clock. I'm going to do my best to save three. Thank you for the court's August 9th order. I'm going to address the two issues the court's identified. We're going to submit on the rest unless the court has questions. Of course, I'm prepared to answer any questions your honors may have. So I also want to acknowledge I'm here joined today by Nara Segino, my associate who's on the briefs with me. And so with that, let's talk about Monte's hearsay statements. Everyone agrees that Monte's statements were hearsay. So the question then becomes did the district court, did the government below meet its standard by preponderance of the evidence to show and below they argue that they were statements in furtherance of a conspiracy, an agreement to do downstream drug dealing between Monte's and Jackson. And on appeal, and we've shown in our opening brief, we attacked that standard. We argued it's a buyer-seller, it's a single transaction, there's no shared stake. And the government has a response that I won't get into it because the reality is there are different responses. They pivoted on appeal. And now they don't say to this court, no, no, it's a cold conspirator exception. They say we're going to rely on a case called Layton. And we're going to say that these statements by Mr. Monte's, even though they're hearsay, were properly admitted because they were co-venturers. And the co-adventurer exception says that because they were part of this joint plan with regard to either the project, as they allege, or count five, that the co-venturer exception gets them home. And so that's the only argument they make to support the admission of the hearsay. And respectfully, the government's incorrect. And the key, I think, is Layton, after they described this co-venturer exception and the historical genesis for it, and they cataloged the other circuits when they were deciding this case, Layton, the court said, and I'll quote, the critical inquiry is simply whether Confederate was acting in his capacity as an agent of the defendant when he uttered the statement sought to be admitted. So on January 27th, when Monte's is talking to Roca, is he, is the evidence in the record, was he Manny Jackson's agent? And respectfully, it's not even close. No way. The same reasons why it was a buyer-seller transaction negotiation shows there's no agency. And there's two very discreet pieces of evidence the court needs to look at. There's Exhibit 394A and 396A. And those are the conversations on January 27th between Monte's and Roca. Again, Jackson's not talking to Monte's during this time. And the first conversation... Wait, let me be clear. So you're saying that Monte's has to be the agent of Roca and not, I mean, the agent of Jackson and not the other way around? Correct. And the quote is, the quote, critical inquiry is simply whether the Confederate was acting in his capacity as an agent of the defendant when he uttered the statement sought to be admitted. And so the defendant here is clearly Manny Jackson, and the hearsay declarant is clearly F. Monte's. And so... So what will I see when I look at 394A and 396A? Wait a minute. Didn't I look at those? I'm sure you did, Your Honor. They're both in the ERs, I think... Can you tie it back to your argument, please? Because I've got them right here, and I'm not following. Correct. And so how I back them is there's only two statements that relate to Jackson. On the first phone call, the only statement is from Roca, quote, will be in you for them other two, close quote. So that's just Monte's telling... That's Roca's telling Monte's, I owe you, we owe you for more drugs. That's not an agency relationship. That doesn't say you're working for Jackson. And the second conversation it starts with, and this is even clearer, this is a couple hours later, about two hours later, Roca starts with, bring me my two. We'll deal with homeboy next week, and we accept the inference that homeboy is Manny Jackson. So I want my drugs from you, Monte's. We, you and me, will deal with how we get drugs for Jackson next week. Counsel? Yes. I don't mean to interrupt, but I do want to go back to your reading of Leighton. Yes, ma'am. And the quote that you said that leaves out the continuation of the sentence of whether the statements were made during the course and furtherance of the common enterprise. And reading the court's statement that you quoted in context, in my view, we are saying that the type of agency or conspiracy that suffices for the evidentiary rule is quite broad, in that it can be a common enterprise, it can be a legal common enterprise, in that the requirements to show strictly conspiracy under criminal law or strictly agency under respondent superior or vicarious liability standards is not what we're talking about for purposes of the evidentiary rule. So I understand you have a different reading of Leighton, but under a broader reading of Leighton, why isn't that evidentiary standard satisfied here? Because the rule and how I read Leighton is it's harmonizing the two. When you're letting a co-conspirator statement in, it's because the person you're letting in, again, it's his admission, and that's what the law considers it. When Monte's is talking, it's Jackson talking. So letting that hearsay in before the jury, Jackson can't complain because he's his confederate and he's authorizing those conversations. When it's a buyer-seller, when it's I'm trying to get something from you, Monte's doesn't bind Jackson because Monte's doesn't bind Jackson. It's not a co-conspirator statement, it's not a co-venture statement, and that's how you harmonize the two. The last thing I say before I... Could you pivot back to... Yes, that's how it's going. My question about 394 and 396A, the two exhibits, please. Yes, yes. That's exactly where I was going. Thank you, Judge Kristen. So he says, bring me my two, and he pushes him off. I'm going to hold for a sec, Your Honor. I'll let this pass if I may. I think we've taken care of it. Thank you, Your Honor. Let me continue. So he says, bring me that two. The other thing he says in that same conversation is, Roka, I'm putting my neck out for Jackson, and two, he walks back a guaranteed payment to say, I'm not 100% guaranteed that I can come through, which means I'm not really going to pay it, which explains why he's going to get bunked later. Neither of those statements from Roka, neither of these transaction negotiations, support the idea that there's a conspiracy for downstream distribution together. I'm going to stop again. Yeah, what's going on here? I think I'm getting an alert from Maui. My watch is off, but my watch just exploded, an emergency alert. My residence is in Lahaina. I think even though my watch is on silent, because it was an emergency alert, it overrode my circumstance. That's okay. I'm fine. I'm here, and don't worry about me. Thank you. Back to Judge Christian, if I may. So he walks that back, but there's nothing about this negotiation with Roka. Sorry, you've got to roll this back a minute. Yeah, I will. I'm sure Judge Gordon will give you a minute, but we need to get this. Because we really need to follow. I mean, I agree with you that this is a very close question, because it seems to me that there's one transaction for drugs that Jackson didn't even pay for. And to say that he had joined this vast conspiracy called the Project is a little bit of a stretch. So I'm really paying attention to what you're saying about how the law applies here and what the facts are. I'll slow down then, and thank you to that, Judge Orloff. If you could roll this back. You pivoted away to answer Judge Sugg's question, that's fine. But if you roll back, we've got them right here, 394 and 396. Okay. So those are the conversations where we're going to try to look for evidence. Is this a transaction where Manny Jackson is telling Montase, you're my agent, speak on my behalf. And those two, and I've given you the quotes, I don't think it comes even close. The only- Just humor me. No, no, please. How you interpret these, because I'm looking at them, just how you interpret this. I interpret it quite simply as Roque is making a five- Go back to what the quotes are. Right. The quotes are, we'll be in you for them other two, and then the same conversation- We'll be in you for them other two. Right. Right. What Roque is saying is, I'm buying five, I'm paying cash in a barrel head, the government's going to come up with $44,000 or 42,500. He's also saying, while he's negotiating his deal, cash on the barrel head for the blue, he's trying to negotiate drugs for Roque, for Jackson, where Jackson's not going to pay for them, and the government's going to give a guarantee. But you're not doing. You're not tying your argument, which I understand, to the words on the page. So what Roque is saying to Jack, Roque says, we'll be in you for the other two. Right. Which means, if you give these two pounds to Jackson, I guarantee the money, I think was the interpretation. I owe you that. I owe you the money. And the second conversation, he walks that back and says, I'm putting my neck out. I'm not 100% guaranteed that I can come through with the guarantee. And that's the full conversation. So- You interpret this to not be speaking on Jackson's behalf because- Oh, no. I think he's trying to make a deal for Jackson, but that doesn't make Montes Jackson's agent. Well, tell me why not. Because that's a buyer-seller relationship. To be the agent is to be part of a joint venture. When Jackson sells the drugs, that profit is sharing with Montes. He's working for them. And the two pieces, I guess, let me- I mean, this is why this is a close call for me. So I want you to look at two other pieces of evidence. Okay. Can we just back up? So you're saying Roque could have, Roque's statements come in because he was the agent of Jackson. Roque's statements, we thought they were hearsay. Oh, because he's the government. The government's entering them as, quote, unquote, context. But the standard is when Montes hearsay comes in, is Montes Jackson's agent. So what are your- what statements of Montes are you saying shouldn't have come in? His entire- neither one of the transcripts where he says it's methamphetamine I'm sending to him because that's hearsay. That's no exception. And we know from two other pieces of evidence. They exhibit 380-2. This is the October 27th meeting. 380-2. When Jackson- this is when they've targeted Jackson. He's out of jail two weeks and he has a meeting with Roque. And what Roque says at that meeting is, they thought we were going to be their drug runners. I told them no. So we're not running drugs for the Montes. We're not in a co-venture with them. We don't work for them. November 9th is the next meeting where Jackson meets Montes. And Jackson says the same thing. I'm not going to sling your dope. So he says in the one conversation we know from Jackson to Montes, he tells Montes, I'm not going to be your agent. I'm not going to sling your dope. He wants to get dope for free that he can sell and pay back his debt. The government gives a guarantee and kind of walks it back. That's what they're setting up to get drugs into Manny's possession. And this is important because these statements identify the drugs as methamphetamine and otherwise we don't know what the drugs were. Correct. It's hearsay that violates the Confrontation Clause unless it fits in the Bourgeois exception. And these arguments show that it doesn't fit within the Bourgeois exception. So that's why Mr. Jackson wins on that point. It's hard to believe that this could get to us in this state with this question so close. Well, I agree with that. Let me, if I can pivot, because I want to talk about the second issue if I could. And I still want to try to save some rebuttal. Don't worry so much about the time. We just want to get to the bottom of this. Yes, Your Honor. So is there anything else you want to talk about that issue on the agency, on the latent issue, the latent limitation? Well, I think my question is, I mean, we're layered here with also the standard of review for the evidentiary decision. But I think there's, you know, the best argument would be that there was at least some basis, evidentiary basis for the district court to say that Jackson and Montes were engaged in a common enterprise to sell drugs, whether putting aside whether there's, they were actually agreement to establish the project and they were in the common enterprise to sell drugs would be a generous way to say that there was a common enterprise here that satisfies the evidentiary ruling. Can I add one piece to that, what I think Your Honor is missing? The judge said no. Judge Snyder said no, this had nothing to do with the project. There's no evidence that the drugs are from Mexico. The project's about drugs from Mexico. The government didn't appeal that ruling. Judge Snyder said their theory did not meet the preponderance standard. That's the record in this case. That's the finding. And so Judge Snyder, who was closer to it than all of us, she said that's an incorrect theory. But if we look at it to say the co-venture, it doesn't hold up. And I think that's why the government's incorrect to pivot. This was a one-off drug deal negotiated by Ralph Roker to put drugs in Manny Jackson's hands while he was getting cash on the barrelhead. It had nothing to do with the project. It had nothing to do with MA. If you look at, and this is just ERs, if you go from 905 to 985, I know that's an 80-page swing, I think it's 915 to 985, it's 70 pages. Those are the actual conversations. There's no common venture here. There is Manny Jackson can't get drugs on credit. Roker guarantees the drugs. There is no commonality. This is a one-off sale that Jackson never pays for, never talks to Montes again after this. This isn't a co-venture. There's not sufficient evidence of that. That's where I land. There's not a single transaction. Jackson just trying to get, like, Montes could be any seller. It doesn't really matter. There's nothing. I remember, he gets out of jail, Roker brings him in and puts money and drugs under his nose and says, you want to participate? And Jackson's like, you get me free drugs? Yeah. And that might have been a terrible choice, but it certainly doesn't make Montes his agent and doesn't permit the hearsay. One other counterargument, I suppose, would be the evidentiary standards for determining common enterprise for the evidentiary rule would be different from the evidentiary standard to determine whether there was actually a conspiracy or agreement to establish the project for purposes of conviction. I think, ultimately, it's the same thing. I think when you look at conspiracy under bourgeois or the co-venture rule under agency, it's the same notion, which is the defendant can't complain when the evidence comes in because he's in cahoots with this person for this venturing. And what the co-venture has, it can be a legal venture. But you're authorizing this person. And that doesn't apply to a buyer-seller transaction. It doesn't apply to a one-time transaction. That would be my argument. Thanks. And so I want to talk, if I could, a little bit about the exclusion of ROCA. And I'll start with, if I may, just a little bit of backdrop, which is, you know, we go back to Miller. And what Miller looks at is when the district court, when there's a proper state interest in excluding evidence, you know, we look at what, sorry, let me start again. Pennsylvania versus Ritchie is the Supreme Court case that says the obvious. A defendant gets to put on evidence that can defeat the government's case. I think that's, the quote is, has the right to put on evidence in support of his defense. And there's no doubt that ROCA was a participant witness to all these conversations. And there's no dispute that no other witness, no other recipient witness to the conversations testified. He was singular in this way. And what's different about Miller, what Stever does is adopts Miller when it's a proper exclusion. But here was an improper exclusion. The government argued to the judge below, and they've abandoned it before this court now, that they couldn't call ROCA just to impeach him. And that's incorrect. 607 says they could call ROCA to just testify that he manufactured the government's case. Jackson got bunk. The Montagues was untrustworthy. They pulled a fast one. They were cold-blooded MFers who tricked them. They got the money from ROCA, but still screwed. So that, it's the wrong ruling. But let's say it was a right ruling. And so I guess the first thing I'll say is I don't understand the government's legitimate interest in excluding ROCA. If their interest, as they articulated, was. What are the district court's ruling on this? Yes. And so Ruth's ruling was pretrial. She said. Is this ER 4280? Am I looking at the right place? I don't know. Where are you looking, Your Honor? I'm looking at ER 4280. That's the written ruling. The written ruling is part of it, but she. The transcript. What? Oh, the transcript. Yes, the transcript is the final written ruling. It's her final ruling on the matter when they called him. And what she said was you were going to do it to impeach him. And it's irrelevant, basically. And the impeachment find is incorrect. Gilbert. The part I'm looking at, and I want to make sure I'm looking at the right part of this transcript, please, because I really want to be corrected if I'm wrong. I have this. While I believe a lot of this may relate to the motion for outrageous government conduct. Yeah. I do not believe that these arguments go to the issues the jury will decide. I don't think there's a need to call ROCA by any party. So I'm going to preclude the defendants from calling him. And then that takes us to the questions of what's going to happen tomorrow. Is that where I should be looking? I think that's part of where you should be looking. I think that's my other question. Where else do I see a ruling? I don't have a citation to it off the top of my head. But in the first part, in the volume one of the ERs, we have a volume three of the ERs. I can get it to the clerk. There was a written ruling pretrial where she ultimately reserves. But that's where Judge Snyder lays out her ideas. I have an oral ruling pretrial at ER 118. There's also a written ruling. And I don't have it off the top of my head, Your Honor. This is where she suggests that it's not relevant. Correct. And so going to oral ruling, you're saying the idea that there's no need to call ROCA. It's not the standard. It's the defendant's right to call ROCA if they so choose. He's a precipient witness. Right. So explain why you needed ROCA for your defense. We don't, again, respectfully, I don't think the standards I have to show I needed him. I think the standards I wanted to call him and he had relevant evidence. Wait a second. Wait a second. Okay. So why, what her finding seems to be is that it's not, his testimony would not be relevant to any point that the jury would have to decide. I can meet that question. That is patently clear error. The same reason the government got to have Detective Uriah testify to these words mean this, here's what crumbs mean. ROCA had testimony about that. That was better. It wasn't commentator, opinion expert testimony. It was participant in the conversation. ROCA understood what these words mean. And the same reason the government was able to call in, quote unquote, expert agents to interpret the calls, the defendants had the right to put those questions to the man who manufactured the case. Because otherwise we're left with the jury hearing, you know, two, he's getting two, right? And we don't have ROCA to explain that. And we don't have ROCA to explain what crumbs means. They say it's quantity. We say it's quality. Whether it was, and what they miss on the, and I think what the, I'm not going to argue Rule 29, obviously, but on the, on the case that the, the counter conviction there's, did he possess meth? Did they, outside the scientific standards show it was meth? What's missing and what ROCA's key to is, was it such garbage that no one could sell that downstream? That it was, it was being thrown away when he finally saw it. There was no intent to distribute because it was crap. It was, it wasn't sellable. Sorry, I'm sorry, your honor. Your argument right now is what you think a jury could have decided about this use of the word crumbs. Is that it? As part of it, I think Ralph ROCA had testimony about what was on the tapes, what they meant, what was excluded, when he stopped them, why he stopped them. Things Jackson said to him that were not on tape. Things that were discussed that were not on tape. He was the percipient witness to whether or not on, on the 31st of January, ROCA got, many Jackson got drugs that were actual drugs that he intended to distribute. And those were relevant subject matter areas. I'm trying to ask pretty specific questions. Yes. Did you need ROCA to explain what the context of what to meant and crumbs, or is there more? There's more. Okay. Tell me what the more is. The more is we, and again, I, I'm going to continue to object to the notion that we needed. I understand that, I voted, but I'm just trying to get at your argument. The defendant said to the judge that we want to elicit from ROCA the facts on how he put together the case, evidence that's missing, and an explanation of the evidence that's presented, including the meaning of crumbs, including the quality of the drugs he received, including his intent regarding the receipt of whether they were drugs or not, including the trustworthiness of the Montes brothers, and including the lies he spoke on the record that make the context of his statements suspect. And I'll give you one clear example of that. In the negotiation of this, the first call is, is ROCA to Manny. And he says, they're going to give you 20 days. They said eight days. I negotiated up to eight to 20. We know that's a stone cold lie. How do we know it's a lie? Because the very next call is to Montes where he begins the negotiation. And he says, did you get the belt? Did you get the Gucci? Did you get the Louis Vuitton? You like the stuff I sent you? Now let's talk business. And I want five. I'm going to pan the barrel. I'm going to try to break something off for Manny. So we know when he lies, he lies all the time. So the jury, that examination of ROCA would have given the jury context to understand the evidence actually presented, to understand additional gaps in the evidence, and to have doubt about whether or not on the 31st of January Manny Jackson received actual methamphetamine and had intent to distribute thereafter. And those were the critical issues here. And he was a percipient witness to them. And the notion that the government can have commentators, and they're relevant, their interpretation, but the speaker and the hearer, he's irrelevant, I respectfully, I don't think that's appropriate. The theory of the defense was that he never, Jackson never actually received meth. So that's why- And that he had, and whatever he did receive, he didn't intend to distribute it because it was crap. And so he attacked, he had an attack for both prongs of possession with intent, possession and intent to distribute. And ROCA had relevant testimony on both those issues that resulted in conviction in a 20 year sentence without a quantity finding. Counselor, you're using your own slang now. Which slang? Well, crap is the word that you just used. Oh, craptastic. I also like to. I'm trying to get at a little more seriously because this is really important to the client. Yes, Your Honor. Please. Right. So we've got this two, and I understand that's quantity. And the jury clearly had problems with quantity. I have questions for the government's lawyer about that. But when we get to crumbs, you're saying that he didn't intend to distribute it because it was, and you used that word that I don't normally use from the bench. So I'm trying to figure out if you're talking about a different, was it a different substance? As in not methamphetamine, it was marijuana or something? No, no. You're close. Okay, then. I think you're very close. What he says is, it's, I've been crumbs, he says a couple times. But it's also in context. He says right before he gets it, when he's trying to check, they establish it's a different color, received on a different date from a different runner. It's different. And he goes, you didn't get the blue. No, it was, my guy says it's white. Just go to my question. I know, I'm getting there. Because you're way over time. I know. The question is, what could a jury, what do you expect the jury to, what did they need help with on crumbs? You're saying, you're suggesting it's something other than a small quantity. No, it was his challenge to the quantity. It wasn't just crumbs. He said that, what Roka said, and what he said is, the Montes brothers are known for selling bunk shit. Before he gets it, he says, they're doing something sneaky. There's something wrong here. He gets, he says, they're cold blooded. This is effing crumbs. And the defense was, he wasn't talking about quantity, because we know it's, because two, it doesn't matter whether it's two pounds or two kilos. Counselor, what is the answer to Judge Wardlaw's question? Of what? The defense theory was that this word meant. He didn't receive methamphetamine, and whatever he did receive wasn't sellable. It wasn't a blue. It was crap in my words. It was garbage in my words. It was bunk shit in Roka's words. It was unsellable, unusable nonsense that he could never have the intent to distribute. And his one phone call on it is calling him cold blooded, blah, blah, blah, and ranting about how they screwed him over. And the jury could have credited that, one, there's doubt about what he received as quality, and there's doubt about whether he intended to distribute it, because he was so unhappy with the quality of the receipt. All right. Let's hear from the government. Thank you, Your Honor. Thank you so much. Good morning, Your Honors. I may please the court. Jenna Williams on behalf of the United States. And I'll just jump right in to what the court was discussing with defense counsel regarding the co-conspirator exception. And first, I want to address the standard laid out in Layton, which I think Judge Sung asked about specifically. Defendant's entire argument relies on an incorrect interpretation of what that agency reference meant in Layton. And I think that's clear from the case itself and its citation to Anderson. So what it means is not someone's an agent on behalf of the other, as in they are authorized to speak on their behalf. What it means is that they're agents of each other and that they're engaged in a common goal together. And that's exactly what the court cited from the Supreme Court case, United States versus Anderson. Said the rationale for both the hearsay conspiracy exception and its limitations is the notion that conspirators are partner in crime. As such, the law deems them agents of one another. So the agent idea comes from this idea of partnership in a common goal. And I think that's clear from- What was the common goal between Jackson and Montez here? To distribute drugs. Montez. It's very clear. That's what they were trying to do. It seems as though from the statements that were made, Jackson was trying to separate himself from the Montez brothers, that he was acting on his own. He had no desire to be in a conspiracy with them. He was a one-time purchaser and he didn't pay for those drugs. Sure. So I think there's a couple responses to that depending on sort of what we're understanding the conspiracy to be in terms of sort of the broader project and this longer term relationship. What evidence is there that Jackson joined the broader project? So from the beginning, Jackson was a participant in these meetings where they were actively discussing this project relationship. He knew immediately from the second he joined, he said to the confidential source, I know you're getting money orders, money from the cartel and sending it to Mexican mafia members. He'd heard that already. That came in as evidence? Excuse me. Sorry. That came in as evidence? Yes. Yes, Your Honor. From the very first meeting in October. And that was, was that taped? Yes. Okay. And then they're talking about the goals. He knew, he actively participated in discussions about collecting debts, about getting a cut of the price of La Familia drugs that were sold for the brothers and it going into this money for the Mexican mafia. He was involved in conversations about continuing this relationship into 2012, the new year and how they need to sort of zero out their accounts because they were arguing about them. So they need to start from scratch. And I think a lot of the facts actually surrounding count five show also that he conceptualized it as part of this relationship. He agreed from the confidential source to send money orders to the Mexican mafia, even though it's not clear if that happened. He did agree to that. He discussed afterwards, they discussed how they wanted more. And that's this crumb statement, which looms really large on appeal. Counsel, I understand that you're pointing to evidence from which one could find that they were engaged in a common enterprise, but how do you respond to the fact that I remember correctly, Jackson was acquitted of the conspiracy charge and then that the judge, as your friend is arguing, actually found that he that Jackson did not agree to be a part of the project. So in light of those, how could the evidentiary ruling still be correct? Well, I think there's even apart from sort of the broader conspiracy, there is common enterprise and a common goal to distribute drugs. And as Linton said, it doesn't have to be as though Roka was distributing drugs for Montez. Like, I mean, he he just wanted his own not even clear. I mean, he didn't distribute the drugs. It's not even clear that he intended to work with Montez in toward a goal of distributing drugs. It seems to me that he was just buying. He bought drugs from Montez one time. That's the evidence in the record. So Roka bought drugs from Montez two times and the defendant. We're talking about Jackson's relationship with Montez. Yes, Your Honor. So I think, and as sort of the court getting to the kind of buyer-seller issue, I just want to make sure. Yeah. How do we so if assuming Rocha is trying to negotiate with Montez for drugs for Jackson to sell, the defense is that Jackson really didn't want to engage in a broader agreement project conspiracy with Montez directly and that that was never established. So how do you connect the dots between Jackson and Montez? And how do you or do you say a single transaction along these lines is enough for the evidentiary ruling? I guess either way. I think in this case, it absolutely is. If the court just wants to look at count five. It's a strange position. We're in on this because at the so perhaps the district court's ruling was correct at the time based on the offers of proof that were given to her. But in hindsight, after the jury's acquittal of the conspiracy charge, it makes us skeptical that there was a conspiracy because certainly the government didn't prove it to the jury. I'll say just quickly on that point, I do think the preponderance standard is the standard we're referring to here. The court can still look at that evidence at that standard. But even assuming we're talking specifically about count five, I want to address the evidence that goes to that and then the harmless error point. So the evidence that goes to sort of the count five being sufficient for a conspiracy, I think first, the biggest factor that shows that the buyer seller rule does not apply is fronting. And that is what happened here. Even though the defendant did not ultimately pay for it, the record is clear that both the defendant and Montes believed that that is exactly what was happening. The source asked the defendant two and 20 days. And he said, yes, he agreed to it. That is what he understood to be happening. He would get two pounds. He'd pay it back in 20 days. And Montes thought that also. He called the informant in April 2012 when he never got paid. And he didn't ask the informant, hey, where's my money? You offered to pay for it. He said, have you talked to the defendant? I'm really in a bad position here. He really screwed me over, to put it the language more mildly. And then he even reached out to Rodriguez-Landa in custody through another inmate and said, what's up with the defendant? He didn't pay me for this. And that, again, shows sort of a full circle project. And the jury heard all that? Yes, the jury heard all of that. Both sides thought that that's what's happening. And I think the fact that they didn't precisely agree on a price, although it was clear it would have been at least $8,500 from the record, that shows an ongoing relationship. That's never how you would do a drug deal with someone that you just met. Like, they had connections with each other. They knew each other. Like, this was a longer term relationship. I think your argument on this point is persuasive. It's strong in a way, certainly. But it is concerning to me that the government argued against allowing Roka to come in. You have your own witnesses to explain what your interpretation was. You know, some of it is sort of slang that's being used. Some of it is sort of shorthand that's being used. Some of it is these, you know, if you look at these exhibits and transcripts where there's missing words and so forth. So how is that not problematic? Why shouldn't I be concerned that the defendant wasn't allowed his opportunity to ask Roka, tell the jury what you think this means right here. What's to mean? What's crumbs mean? Right. So my first response to that is defense counsel never said that to the district court. Never said what? Never said, this is what I want him to talk about. Well, you have a prof. There is a proffer in the record where the first point the defense says is we want Roka to testify as percipient witness because he participated in these conversations. And then there's argument where the where the defense says, you know, it's a strange position where the government's allowed to have Narita come in as a lay witness to explain what these conversations meant. And we can't have Roka. And I don't think it was the district court's position or the government's position that that would never be something that they could do. But again, there was no reference. What do you mean by that? Because the government was saying we want to completely exclude Roka, the defense from calling Roka and the judge granted that. I apologize. I'll be more specific. There was nothing that they, what defense counsel said was we want him to talk about the recordings. There were six weeks of recordings in this trial, hundreds of recordings, never an explanation of what defense counsel, a theory that defense counsel had in mind. Did they ever get more specific than this? Is that what you're saying? I'm looking at the, what Judge Sung's referring to is the SER 196, which is the written proffer, right? And they said, while other government witnesses, notably members of law enforcement, have been permitted to testify as to their lay opinions of the content of the recordings, right? Confidential source one can offer, and then he hit those two things, right? First hand information about the meaning of the conversation. So I certainly read that with the benefit of 20-20 hindsight of encompassing that they want to be able to ask Roka about, you know, crumbs and two, okay? And maybe, so maybe what you're arguing is there's not, they never got more specific than this. I think, yes, that's correct, Your Honor. They never did. What requirement did they get more specific than that? And in fact, why should the defense have to tell the government what specific questions they wanted to ask of a witness? There's no requirement as to that. And that's, I think, asking a little too much from the defense to put forth every specific thing and to government their arguments. Was this pre-trial, this written? This was pre-trial during trial, this proffer? They happened in both. I had a question for you. I'd like you to answer it, Your Honor. So I think one answer is they could have easily done this in camera. The district court offered that to another defendant. So that was a possibility. The second point is I do think there's a requirement under Ninth Circuit case law to stay with some level of specificity. Well, that's what I'm asking in terms of Judge Wardlaw's question. Is your answer to her question pre-trial they have to do that? No, during trial. There were... This April 25th, was this during trial? So April 25th, I believe, was during trial. But the court made rulings right before the defense case on this in 17 ER 3886 through 92 and in 18 ER 4268 through 80. And that was after all of the government's evidence was presented. Defense counsel was very aware of this Crum statement. She was the one who cross-examined Detective Ureta about it. The government never put forth any evidence about it, never referenced it in closing. What's the reason that the government did not want Rocha to testify? He had no relevant evidence to testify about based on what defense counsel was proffering. And it seemed to be that the main purpose was to elicit... How is the meaning of all these phone conversations not relevant? Well, I think it's hard to talk about that without reference to what was proffered. The Crum statement is the only thing defense counsel is saying on appeal made any difference. Well, the proffer was we want Rocha to testify about what all these conversations meant. He was a direct participant. He has relevant testimony about what he understood Jackson to mean. How is that not relevant to the defense? Well, I think the only thing that they're saying that would have been relevant is the Crum statement. It seems to me that Rocha is the person who ties this whole thing together, who ties Jackson and Montes together. And he seems to be at the very center of this. I suspect there are substantial reasons why the government, as a practical matter, did not want Rocha in the courtroom. However, I think there's a strong argument based on the fact that he was the precipient witness to each and every one of the hundreds of tapes that were admitted at this trial. Well, I think looking at the sort of Miller factors helps reflect why this evidence, again, the only thing that defense counsel has ever said would make any difference to the count of conviction, which is count five, is this Crum statement. So I think that's what this court needs to evaluate. The jury had trouble with count five. It didn't really buy into the government's theory, it seems to me. Well, so I think what the jury found, there was no, as defense counsel argued in closing, there were no drugs seized for count five. I think, you know, perhaps they credited to some degree defense counsel's argument that we don't know what it was, the drugs were seized, you know, in the other count. There's the, we just went around and around about what Crum's means and does that mean it's a different substance and whatnot, but there's also just the two. I mean, a testimony here was two in the government's theory, I think, was that this was two pounds of meth. That's not what the jury found. So I think what the jury may have done was we didn't seize it. The government didn't seize it. We don't see the drugs. We don't know exactly what it was. They did have some discord between each other. But what they did find and what they know they found was there was an amount of methamphetamine that was distributable that they believe defendant intended to distribute. Right, but the point is, is that defense wants to say we could have called Roca. He could have said that Jackson was actually saying in this conversation that what he actually received was not meth or not distributable meth. And in which case, it seems very possible, given the jury's verdict with additional evidence like that had come in, that they would have found no meth. I want to push back about that a little bit, and this is maybe more on the harmlessness point. If we look at that statement, that is simply not the plain language of the statement. That's not what it meant. The way defendant, and not even sort of trying to speculate what the source would have said it meant, I do think it's clear from the context. That is not what it meant. And it's not... What if we disagree? What's the clear context? What's the clear reading that you take from this? The clear reading of this statement is that this, and I'm looking at it right now, the source says that stuff was pretty good, and these guys want more now. And defendant replies, yeah, this was like crumbs for real. The source replies, I know, these guys want like, you know, 50. And he says, again, this is like crumbs. They want more. They want 50. That is quantity. That's how it's referred to throughout this entire... I've read a lot of the before and after of this, and let's say, for the sake of argument, I don't understand exactly what they're talking about. Why isn't roaches? You have Eureta giving one interpretation, lay interpretation of what all this lingo means, right? Why isn't roaches testimony relevant? I think also because, aside from the plain language of this, all of the evidence presented by trial, the common sense interpretation of it, is that defendant knew exactly... That defendant believed he had valuable methamphetamine. And I can just go through some of those reasons. One, he never... He's talking to his friend in the Mexican mafia, the source. He knew he was getting two more pounds of meth. He never says, mine was bad, don't get it. He never says, I'm not paying for it because it's bad. He never... Like all of the common sense interpretation of this, he agrees to do money orders, is that he believes he got something of value. And defense counsel essentially conceded that in her closing. But there's also no dispute that he never paid for it, which does seem consistent with the defense theory of the case. So I think a lot of what you're representing requires one interpretation of all these phone conversations. The defense is saying, if we put Roche on the stand, we think he would have given a different interpretation. So why isn't that relevant? I think, one, they never said that at the time, because the reality is that's not what they believed he would have said. That is something that's being argued on appeal in retrospect. Two, defense counsel actually argued against that in closing when she was fighting the conspiracy point. She said, he did get something of value and he never paid for it. That shows you that he had no interest... Right, but how do we know it was methamphetamine as opposed to marijuana or... I don't think the argument has ever been that it wasn't meth. Wasn't today. It's that he didn't have distributable meth, meaning it was of such bad quality that he could never have distributed it. Right, he seemed to disclaim that today. So was the district court's ruling, this ruling that I'm looking at at ER 42-AD, which is the one I just read. I think I read it out loud. Well, I believe this, a lot of this may relate to the motion for outrageous government conduct, but it wasn't going to go to, you know, be relevant to issues the jury would decide. Right. That's the ruling. So that was... Response to the proffer. I think that is, I can't remember if that was the last ruling or not. They're, the oral rulings are very close in time to when. So I think maybe... So my problem is I'm not sure that the judge ever ruled on, the district court ever ruled on, again, you know, hindsight is perfect, right? Right. I appreciate that. But at SER 196, it seems like the written proffer tells, suggested to the judge that this confidential informant was going to testify on two different subjects. And one was this, it's admittedly very broad, right? First time for information regarding the meaning of the conversations. And then the second is really the existence of the conspiracy. So I'm not sure that I see a ruling on, she's ruling that she thinks that Roka's own, or the district court was ruling that Roka's testimony is only going to be relevant to the outrageous government conduct concern. But how is it the case that the meaning of the conversations wasn't going to be something the jury was going to have to decide? Well, I think because that ruling came in the context of, that sort of the most specific that that conversation got was the reference to statements related to the conspiracy. Count one. And that's not relevant here, which is why it's not being argued as a basis on appeal. Right. So that's, I think that's a more specific version of the meaning of the statement. She's saying... Wait, wait, wait. So I want to... So I'm reading this as SER 196. I'm reading these two different topics, right? Roka can testify to these two different things. Are you suggesting I should be reading the second as a sort of a more specific version of the first? I think that's how I read it, was that that was as specific as they got about those statements was, and there were a bunch of statements related to the conspiracy that Rocha made that said like, you know, things like we're fighting about stuff, we're disagreeing, things that they wanted him to talk about more to say, see, there was no conspiracy here related to the project. Um, and the district court said that wasn't relevant for, you know, and that's not being discussed here, because again, count one, we're focused very narrowly on count five. So that's as specific as... Well, at the time of that ruling, all the counts were still in play, correct? Of the district court saying Rocha's recipient testimony about the meaning of those conversations at the time that the district court judge said, I'm going to bar the defense from calling Rocha as a witness, and said, I don't think his Rocha's testimony would be relevant. All the counts were still in play, correct? Yes, that's correct. But I think, again, this gets to the rule 103 issue and what this court requires of sort of... What is your best case for that the proffer that we're talking about was not specific enough? I think it's referenced to, first of all, rule 103 in the court's explanation that general statements of evidence are not sufficient. And I think if you sort of look at the cases, Stever, Cruz's SCOTO, all the cases the government cited, defendant proffers a real articulable theory about how evidence relates to their defense. It's not an unreasonable expectation, particularly after six weeks of trial, for them to say that. And I think in... Excuse me, I don't want to split hairs, but I did ask you a couple of times about when was this? And I thought you said that it was pre-trial or during trial. Now you said after six weeks of trial. So can you... So I apologize for not being more specific. I wasn't sure precisely when that written ruling... April 25th was pretty close to the end of trial, but I know one of these two oral rulings was between the government's case and the defense's case. So this issue was discussed multiple times, including at the end of the government's case. Was Rocha available to testify? I don't know the answer to that.  If there were to be a retrial, would he be available? I don't know the answer to that, Your Honor. Are there any further questions? Okay. Thank you. Thank you very much, counsel. I'll give you a couple of minutes more. Thank you. I'll just be brief. I'm going to run through four short points if I might, Your Honors. One, and I want to be clear, I should have said this in response to your letter. We should have included this in our reply brief. Leighton comes after... Leighton precedes Bourgeollais. And to the extent Leighton describes a rule that was not an exception to the Confrontation Clause at the time of the finding, like a co-conspirator exception, it may no longer be enforced against Mr. Jackson. And that's why we argued the co-conspirator exception, because Bourgeollais says it was, this is still pre-coffered, a rule recognized at the founding of the Republic. So even though Bourgeollais... What Leighton says is you can have co-ventures about legal things and agency for statements, I don't think that survives the Confrontation Clause challenge after Bourgeollais. And I think in any case, they didn't show agency. Two, fronting evidence. I think the government just misunderstands it. Fronting can be evidence of a shared statement, a shared stake, but it doesn't establish a shared stake. It has to be looked at in context. Here, it wasn't fronting because the money was guaranteed by the United States by ROCA. So it wasn't fronted. It was on credit. And it wasn't a shared stake because the October 27th meeting and the November 9th meeting... It wasn't fronted. It was on credit? Yes. What difference are you drawing? What's the distinction? Fronting, the idea that fronting can show a shared stake is, I'm going to give it to you, front it to you, you'll pay me back when you sell it because we're sharing the profits. What's the difference between that and being on credit? You owe me the money whether you sell it or not. I don't have a shared enterprise with you. And that's Lennox and Mendoza and Ramirez, that there's a difference. You're looking for evidence of shared stake. Fronting can provide that evidence. Here, the evidence was, it was the government guaranteed it and Jackson didn't have a shared stake. So it doesn't help them. Just getting on credit isn't the answer. That's a facile misreading of Lennox and Ramirez. It could be evidence that they had a shared enterprise, but here on the two meetings, October 27th and November 9th, Jackson and ROCA disclaimed shared enterprise and drug dealing. So that credit doesn't get them home under Lennox. Three, I think Your Honor repeated them. It's not whether it's distributable, some reasonable standard. It's whether Jackson intended to distribute what he had. And I know that's a nuanced difference, but it's an important difference. It's beyond a reasonable evidence of someone's intent, not whether something was possible to be distributed. And the intent to sell, does it matter? I mean, the timing? Because it seems like the government's arguing at the time that this transaction occurred, Jackson intended to sell what he received because he expected to get sellable drugs. And you're saying, but he didn't actually receive sellable drugs. So after he realized that, he no longer intended to sell. Which intent matters? I think it's upon receipt, upon possession, when he looked at it, did he intend to distribute it would be the property. When he was actually possessing it, but then he didn't actually possess. But he understood it. His agent possessed it. He wanted to distribute drugs. We're not distributing that, but when he got it, it's like I ordered 10 Matchbox cars and they come and they're all smelt in a pile of metal. Can I sell that to a scrapyard? Yes. But if I'm trying to sell Matchbox car, that hunk of metal. Do you have a case that says that's when we should look at what the intent is? I do not. The last two points, the government says we know it's meth because he says, ROCA says other people want it. It's good stuff. This is the conversation that establishes ROCA got the blue and Jackson's been told he got the white. So ROCA bragging about how what he received is awesome has nothing to do with what Jackson received, which was different. And the very last thing I want to say is the government said about ROCA's testimony, said he never said this. Jackson never said this. Jackson never said that. That's the problem. How do we know that? ROCA decided what to tape. ROCA decided what was maintained. We could have asked them about that, but they can't say that Jackson never said something based on the partial recordings ROCA made that's why we needed ROCA. And it's an unfair argument to say Jackson didn't say stuff because it suggests that ROCA made complete recordings of all these. And we know that to be inaccurate. Can you address the issue of the specificity or lack thereof of the proffer and the timing of the proffer? And I think the government is arguing at the close of the government's case, defense could have come back and made a more specific proffer about why they wanted Rocha to testify. Okay, I will address that and I'll rest with that. One, the juristic court understood the proffer and in real time, the government did say, we don't understand what they want. We need a more specific proffer. The district judge understood it in her written order. She faithfully recited the intended uses of the testimony. And in real time, we think it was sufficient. She wanted to talk about the conversations and there's no rule that says the defendant has to deliver to the government and the judge, their direct examination of witnesses in their case. It was clear to the district judge to make the ruling that they wanted to inquire. And as you pointed out, and the court recognizes, everything was in play. And they wanted Rocha to talk about the project. They wanted Rocha to talk about the Jackson didn't join it. They wanted Rocha to testify that he had nothing to do with the subsequent sale to Rios. Obviously the jury verdict, sustaining the defense without Rocha's testimony, takes that away from us now. But in real time, the defense, both Mr. Windsor and Ms. Jacks did an excellent job. And Judge Schneider understood what evidence they wanted. She said incorrectly that it would not affect any issue to be decided to the jury. And we respectfully contend that was an incorrect decision. And just like the detectives had something to add the equation, the precipient witness had something to add and the defendants had a constitutional right to put him before the jury. Even if they just wanted to beat him up. But there was proper reasons. There was no proper government interest to exclude him. And he was excluded to my client's prejudice. And we think we get a new trial. This transcript says that in this transcript, the defense argued they didn't intend to attack his credibility. I think they, well, I didn't think they said it directly. I think what the substance of it was, they wanted one of the subject avenues and the court thought incorrectly that it was limited to outrageous government's conduct. The subject matter of how he decided what to tape, what was taped and what wasn't taped, what was put together and what was excluded was fair game. I see that as impeachment of the government's case. Whether they articulated it that way or not is fine. But that was clearly part of the proffer. And I think that's legitimate basis. He says we're not gonna need Ralph Rocha to impeach himself. There's plenty of impeachment that's already. So I just wanna be clear. Right, yeah, I think we're talking apples and oranges. I'm talking about Ralph Rocha had evidence about when they make the argument that Jackson never said X, never said Y, Rocha had the evidence of whether or not that was a true argument. Yes, I understand that argument. That's what I'm getting at. And maybe Jackson did say, I'm throwing this away. I can't resell this. This is the worst garbage for my words. We don't know and we didn't have the tapes and the one witness who could have told the jury what the answers were and assess his credibility, we would deny the opportunity to call the witness. All right. Thank you, Your Honor. Thank you, counsel. U.S. v. Jackson will be submitted. And I think we'll take a five-minute recess before we take another hour of argument. So this court is adjourned for about five minutes. Thank you, Your Honor. All rise. Thank you, Your Honor.
judges: WARDLAW, CHRISTEN, SUNG